# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

UNITED STATES OF AMERICA,

   Plaintiff,

      v.

RAVI YANAMADULA,

   Defendant.

No. 04 CR 166 - 3
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Defendant Ravi Yanamadula, a former head trader for John Dawson and Associates ("Dawson") is charged with participating in a scheme to defraud Dawson clients of roughly $8 million in assets. Yanamadula has moved to dismiss the indictment on the ground that the government failed to indict him within the five-year statute of limitations set forth in 18 U.S.C. § 3282. The government argues that Yanamadula fled the jurisdiction to avoid prosecution, thereby tolling the statute of limitations under 18 U.S.C. § 3290. I ruled that Yanamadula's statute of limitations defense was a matter to be determined before trial and conducted a hearing during which the government presented oral testimony and written evidence. Yanamadula had an opportunity to cross-examine the government's witnesses and present evidence, and both parties submitted written briefs after the hearing.

Section 3290 tolls the five-year statute of limitations for "any person fleeing from justice." 18 U.S.C. § 3290. The government shoulders the burden of establishing, by a preponderance of the evidence, Yanamadula's intent to avoid arrest or prosecution. *See United States v. Marshall*, 856 F.2d 896, 897 (7th Cir. 1988). An indictment is not required for the tolling statute to apply. *See id.* at 898-99 (citing *Streep v. United States*, 160 U.S. 128 (1895)).

> The tolling statute reflects the congressional belief that where the defendant impedes the discovery and prosecution of his criminal conduct by 'fleeing from justice,' his right to avoid prosecution for distant offenses is diminished while the government's need for additional discovery time is strengthened.

*Id*. at 900 (citation omitted).

The government claims that Yanamadula's intent to flee is demonstrated by: 1) his travel abroad during the government's investigation and his failure to establish a clear residence or place of abode; 2) his failure to maintain contact with his civil and criminal attorneys; and 3) his perpetration of a lie that he was estranged from his wife, a lie intended to make it difficult for prosecutors to locate him during the statute of limitations period. Yanamadula claims that there is insufficient evidence of his alleged flight and suggests that the government bungled its investigation into his alleged crimes and now wishes to escape the statute of limitations by manufacturing evidence of flight.

***Investigations and Litigation Related to Yanamadula's Trading at Dawson***

In October 1998, the Securities and Exchange Commission ("SEC") began a wide-ranging investigation of unauthorized trading at Dawson by Yanamadula and others. Yanamadula was also the subject of a grand jury investigation, which commenced at roughly the same time. In January 2001, the SEC subpoenaed Yanamadula to testify in connection with its investigation. Yanamadula asserted his rights under the Fifth Amendment and refused to answer the SEC's questions or to produce documents.

Attorneys for the Securities Investors Protection Corporation ("SIPIC") subsequently brought suit in federal bankruptcy court on behalf of Dawson's creditors against Yanamadula, his wife Usha Nuthi, and other Dawson employees. Between 2001 and 2004, Yanamadula was

2

represented in this litigation by attorney James McGurk. His wife was represented separately by attorney Chris Gair. On September 5, 2002, Yanamadula and McGurk appeared in Chicago for a deposition in the bankruptcy suit.[1] Yanamadula again invoked his Fifth Amendment rights and refused to testify during the proceeding.

A day before the deposition, SIPIC attorneys informed federal prosecutors that they expected Yanamadula to appear in Chicago. Prosecutors prepared a grand jury subpoena for testimony and document production and served the subpoena on Yanamadula when he appeared for the deposition on September 5. Yanamadula and his criminal attorney, Joseph Duffy, appeared later that day pursuant to the subpoena. Rather than testifying before the grand jury, Yanamadula met with Assistant United States Attorney William Hogan ("AUSA Hogan") and other government agents.

During the meeting, Hogan informed Yanamadula that he was a target of a grand jury investigation and would be indicted for his activities at Dawson. Government agents then presented Yanamadula with a two-hour summary of evidence implicating his role in the illegal trading, including evidence of his "fingerprints" on fraudulent trades and evidence that his February 1998 firing was a ruse.[2] During the meeting, Yanamadula refused to proffer any information or otherwise cooperate in the criminal investigation and he did not produce any documents in response to the subpoena after the meeting.

---

[1] Yanamadula's wife was deposed in the same matter on October 30, 2002.

[2] The government alleges Dawson falsely claimed to have fired Yanamadula in early 1998 to appease its clearing firm, when in reality, Yanamadula worked at Dawson until approximately October 1998.

*Yanamadula's Whereabouts*

Dawson collapsed in late 1998. In July 1999, Yanamadula left Chicago to live with his wife (Nuthi) in Huntsville, Alabama. He initially moved to a residence on Willowick Trail in Owens Cross, Alabama. In 2001 he filed a change of address form with the Postal Service indicating a new residence on Eustis Drive in Huntsville. Yanamadula filed no other change of address forms between 2001 and 2004, but admits that in mid-2003 (in the critical months before the limitations period expired) he lived not at the Eustis address but with his wife's parents at a different Alabama address.

Yanamadula filed an affidavit professing to outline his extensive business travel between 1999 and 2004. Yanamadula left the country frequently, often to locations in India, Eastern Europe and Canada; his trips lasted from a few weeks to several months. The affidavit offers only vague details about his travel, and he did not provide airline tickets or other documents that would confirm the exact dates or purpose of his travel. Government documents establish departure dates and destinations for some of his travel.[3]

The government's effort to locate, serve or indict Yanamadula during the statute of limitations period is only one factor to consider in determining whether Yanamadula fled this jurisdiction to avoid prosecution. *See United States v. Greever*, 134 F.3d 777, 780 n.1 (6th Cir.

---

[3]The government makes much of the fact that prior to 2001, Yanamadula used either his Indian passport or his green card when departing or entering the country, and suggests that because "individuals who use different documents to travel in this manner are usually seeking to mask their travels," Yanamadula must be suspected of doing the same. This gross generalization offers no assistance to this trier of fact, particularly when there is no evidence establishing that Yanamadula attempted to disguise his travel abroad during the period prior to October 2002. Moreover, after Yanamadula became a citizen in 2001, he used his American passport when traveling into and out of the United States.

1998) ("the nature and the extent of the efforts of government agents to locate the defendant is one factor to consider in determining whether it is reasonable to infer from the agent's failure to locate the defendant that the defendant was acting with the intent to avoid arrest or prosecution"). At least one government agent believed the government had sufficient evidence to indict Yanamadula on September 5, 2002 even without his testimony before the grand jury or the production of documents which might further the investigation. The government argues that it neither indicted nor served Yanamadula with a grand jury subpoena prior to September 2002 because it was still mid-investigation, and because it believed Yanamadula was out of the country and that any effort to reach him by telephone or mail would be fruitless.

This argument is unconvincing, as I explain below. Yet the government offers more compelling evidence that subsequent to the September 5, 2002 meeting with AUSA Hogan, Yanamadula became truly difficult to reach and actively thwarted the government's effort to locate him in the last year of the statute of limitations period. The government provided little evidence of its effort to locate Yanamadula during this period, and in all likelihood relied too heavily on hearsay evidence. However, that is only one aspect of the question before me: whether there is sufficient evidence that Yanamadula fled the jurisdiction to avoid prosecution.

***Evidence of Flight Prior to September 2002***

The government did not meet its burden in attempting to prove that Yanamadula intended to flee prior to the September 2002 meeting with prosecutors. Though Yanamadula admits that he traveled extensively during this time, the government presented no evidence that Yanamadula could not have been reached by mail or in person at his residences in Alabama. Yanamadula traveled using both his "green card" and later his United States passport: documents that could

5

have allowed the government to trace his whereabouts. He was also in contact with his civil attorney during this period. When summoned to a deposition in the bankruptcy case, Yanamadula duly appeared, though he refused to testify. There is no reason to believe the government could not have located him prior to September 2002 had it exerted greater effort. I find insufficient evidence of his flight prior to this date.

*Evidence of Flight after September 2002*

The government paints a convincing picture of a suspect who, in the last year of the statute of limitations for the crimes of which he was accused in the September 2002 meeting, sought to conceal his whereabouts from the government while fostering a myth about an estrangement from his wife for the same purpose. After leaving the country for an extended business trip in October 2002, less than a month after his meeting with AUSA Hogan, Yanamadula returned to the United States only a few times before the statute of limitations purportedly expired.[4] He does not explain where he resided during his early 2003 return, and after returning in the summer of 2003, he moved to an address never officially listed as his residence. Finally, during this series of extended trips abroad, he failed to maintain contact with both his civil and criminal attorneys.

---

[4] According to government documents, Yanamadula returned to the United States in January 2003. Yanamadula does not mention this return in his affidavit, but he admits to departing the United States in March 2003, purportedly to travel to France, so he returned at some point. He fails to identify where he resided during his return. Government records establish that he left the country at some point before June 2003, when he returned to the United States from Canada. Yanamadula claims to have returned to the United States only in July 2003, in order to complete the round-trip ticket that began in October 2002. Government records contradict him and show his arrival in the United States from Madrid in August 2003.

Between the September 5 meeting with AUSA Hogan and his October trip, Yanamadula took several steps suggesting that he intended to remain out of the country for an extended period. On September 15, he enrolled in electronic bill payment for a Merrill Lynch account, which allowed him to access the account and pay bills via the Internet. On September 26, he withdrew as custodian of a Merrill Lynch account belonging to his son, just four months after assuming this role; Nuthi replaced him as the custodian. The day before his trip, he withdrew $9,500 from his joint checking account with Nuthi at Colonial Bank. There is no evidence that this money was deposited into any of his other accounts. Finally, Yanamadula purchased the ticket for his October 3 flight just one day before his departure.

Prosecutors relied primarily on Yanamadula's attorneys, and attorneys involved in the SIPIC bankruptcy litigation, for information regarding Yanamadula's whereabouts. While Yanamadula was in regular contact with his bankruptcy attorney, McGurk, through September 2002, their last contact was on October 23, 2002.[5] After October 2002, Nuthi's bankruptcy attorney Chris Gair would serve as a primary source of information regarding Yanamadula's whereabouts.

Nuthi would have served as an obvious point-of-contact for reaching Yanamadula, but the government alleges that it did not pursue this avenue after being led astray by a deliberate course of disinformation perpetrated by Yanamadula and Nuthi through Gair. Gair twice informed AUSA Hogan that the couple was estranged; he conveyed this same information to one of the SIPIC attorneys. While Gair may have made these comments to distance his client from her

---

[5]At the time, Yanamadula owed McGurk roughly $6,000 in legal fees, and McGurk's subsequent efforts to contact Yanamadula related to the outstanding bill.

7

husband's allegedly criminal activity, Yanamadula himself avers to a separation from his wife, claiming that in June 2003 they "reestablish[ed]" their relationship after a year of difficulties and that one month later they "agree[d] to give [their] marriage another chance." (Def. Aff. ¶¶ ii, mm.)

While his relationship with his wife allegedly fell apart, Yanamadula maintained active control over their financial affairs and engaged in behavior suggesting anything but an estrangement. During her deposition in the SIPIC case, Nuthi admitted to a lack of sophistication and knowledge in trading equities and options and admitted that her husband ran her brokerage accounts. Yet neither the type nor quantity of trading in Nuthi's brokerage account changed in any meaningful way during the period in which she and her husband purportedly separated. Throughout late 2002 and 2003, Nuthi's account continued to evidence sophisticated options trading. Moreover, between March and June 2003, $80,000 was transferred from Nuthi's personal Colonial Bank account to her husband's company, Heart Entertainment. Finally, in late October 2002, Yanamadula and Nuthi took out $1 million life insurance policies with each other as beneficiaries. Both policies were paid on January 22, 2003 through Nuthi's Merrill Lynch account. These are not activities one might reasonably expect from a couple experiencing "events" that cause them to break off their relationship.[6] (Def. Aff. ¶ ii.)

This evidence leads me to believe that claims of the couple's separation were a ruse designed to keep the government off Yanamadula's trail until the statute of limitations expired.

---

[6]In her October 2002 deposition, Nuthi stated that she "thought" her husband was somewhere in India. The government suggests that this was an effort to create an impression that she and her husband were estranged. Having reviewed the entirety of the deposition materials provided to me, I do not find the government's interpretation of her statement convincing, and I accord it no weight here.

Yanamadula suggests that the government was foolhardy to rely on Gair's claims about his location and the couple's total estrangement, and made insufficient efforts to discover his whereabouts.[7] This may be true, yet it is not an effective response to the government's allegations, and evidence, that Yanamadula deliberately concealed his whereabouts, or at the very least, made his location almost impossible to discern.[8]

Yanamadula has shown that his civil attorney, McGurk, possessed both his Nextel number and his wife's business address.[9] Alone, that fact weighs in favor of Yanamadula's claim that he did not intend to flee prosecutors. However, Yanamadula broke off all communication with McGurk after October 2002, and other evidence tilts the scales in favor of the government's theory that Yanamadula intended to avoid any contact with the government that

---

[7]For example, government agents were "surprised" when they learned in September 2002 that Yanamadula would appear for his deposition in the SIPIC case.

[8]Other evidence suggests that Yanamadula's claims of extensive, business-related travel during 2002 and 2003 are false. Yanamadula and Nuthi's federal and state tax returns for 2002 and 2003 do not reveal any income from Yanamadula's business, Heart Entertainment. The only income reported in those returns is from Nuthi's medical practice. Nor do the 2002 and 2003 tax returns list a single deduction for Heart Entertainment despite Yanamadula's global travel in support of that business. It is unreasonable to believe that Yanamadula would not claim any legitimate business expenses as tax deductions, as he claimed a $375,000 deduction in 2002 for the bankruptcy of another business enterprise.

[9]In 2004, McGurk moved to withdraw his representation of Yanamadula and sent a copy of his motion to Nuthi's business address: 420 Lowell Drive in Huntsville, Alabama. In his affidavit, Yanamadula avers that at some unidentified point in time, he and Nuthi "directed" that the "bulk of their mail" be sent to this address. (Def. Aff. ¶ 4.) McGurk's mailing provides some support for this claim, as does the government's evidence that in late 2003 and early 2004, a mail cover of the Eustis Drive address revealed that almost no mail was sent to that residence. However, there is no evidence Yanamadula filed an official change of address form or otherwise gave notice of a new residence in Alabama.

would further its effort to prosecute him. Even if the government had been more diligent in its search for Yanamadula, there is little evidence suggesting it would have found him.

For example, Yanamadula does not state where he resided during his brief returns to the United States between October 2002 and March 2003. When he returned in the summer of 2003 after his reunion with Nuthi, he claims to have lived with her parents. That address was never disclosed to the government nor was it included in any document the government might have accessed. Additionally, in more than 20 different financial documents Yanamadula completed between March 2002 and January 2004, and which called for his telephone number, he disclosed his cellular telephone number (the only telephone number he maintained throughout this period) in only a single document – one dated after the expiration of the statute of limitations. In all of the other documents, Yanamadula either left his telephone contact information blank or provided Nuthi's business telephone number.

Finally, after an inadvertent meeting with Yanamadula's criminal defense attorney Joseph Duffy in the summer of 2003, the government attempted to secure a statute of limitations waiver from Yanamadula. Duffy, however, did not know Yanamadula's whereabouts. I find Yanamadula's lack of contact with his criminal defense attorney, after learning in no uncertain terms that he was the subject of a grand jury investigation, significant evidence of his intent to avoid prosecution.

In *United States v. Marshall*, the Court of Appeals for the Seventh Circuit upheld the district court's application of § 3290 to toll the statute of limitations when a defendant left his wife, could not be reached at the locations where he was previously found, and did not tell family members of his whereabouts. 856 F.2d at 901, n. 5. While Nuthi knew of Yanamadula's location at some point during his October 2002 to July 2003 absence, *e.g.*, when they purportedly

reunited in Canada, she testified at another time that she did not know of his exact location. During this same period, Yanamadula had no contact with his counsel. When he finally returned in late summer 2003 he moved in with his in-laws and filed no change of address forms to notify anyone of the change. While Yanamadula's effort to hide his location was perhaps more subtle than that of the defendant in *Marshall*, it was just as successful. Accordingly, under § 3290, the statute of limitations was tolled, and the government's indictment was timely.

For these reasons, Defendant's Motion to Dismiss the Indictment is DENIED.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: January 10, 2006